UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| KELLY DEAN BRENDE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  2:15-cv-09711-JAR-TJJ |
| | ) | |
| RELIANCE STANDARD LIFE | ) | |
| INSURANCE COMPANY. | ) | |

Defendant.

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

**PAGE**

I.      STATEMENT OF THE CASE……………………………………………...3-4

II.     MEDICAL PROFESSIONAL REFERENCE TABLE..………………….....………5

III.    STATEMENT OF FACTS……………………………………...……………6-12

IV.     APPLICABLE LAW…………………………………………………………...13

        a.   Summary Judgment Standard……………………………………………13

        b.   Standard of Review…………………………………………………...13-15

V.      ARGUMENT……………………….....……………………………………16

        A.   Reliance unilaterally and improperly added an objective medical evidence
             requirement into the policy………………………………………...………16

        B.   Reliance improperly invoked the policy's Mental or Nervous Disorder
             limitation…………………………………………………………………20

        C.   Reliance lacked substantial evidence in making its determination that Brende
             could perform her Regular Occupation………………………………….…24

        D.   Reliance acted unreasonably in giving no weight to the video surveillance
             evidence and its corroborative effect on Brende's subjective complaints……….28

        E.   Reliance unreasonably afforded controlling weight to the exams conducted by Dr.
             Bellino and Dr. Kaplan……………………………………………….……..30

VI.     CONCLUSION……………………………………………………………39

I.    **STATEMENT OF THE CASE**

This case arises from a combination of puzzling medical conditions ailing Plaintiff Kelly Dean Brende ("Brende"). These conditions preclude Brende from performing the material and substantial duties of her regular occupation. Defendant, Reliance Standard Life Insurance Company ("Reliance"), terminated Brende's long-term disability ("LTD") benefits under an employer provided disability plan. Brende brought the present action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, et. seq., contending that Reliance breached its duty under the insurance contract by improperly denying her LTD benefits.

In September 2012, Brende ceased working as an attorney and partner for the law firm Swanson Midgley, her employer since 2005. She ceased working as a result of the sudden onset of neurological impairments. Following the disability policy's three month waiting period, Brende applied for benefits in December 2012. Reliance approved her application and paid Brende benefits through December 2014. Characterizing Brende's condition as psychogenic, Reliance invoked a part of the policy limiting benefits to 24 months in cases involving mental or nervous disorders. In denying Brende's appeal of Reliance's termination of benefits, Reliance later also concluded that Brende failed to provide objective evidence of her conditions. Reliance further found that the medical evidence generally did not support the presence of a neurological condition that would warrant work restrictions and limitations from a physical standpoint.

Physicians have varied in their diagnoses of Brende's conditions. Diagnoses include left hemi-sensory dysfunction, hypothalamic-pituitary-adrenal axis dysfunction, methylation disorder, hormone imbalance, neurotransmitter dysfunction, vitamin deficiency,

3

indeterminate left-sided weakness and numbness, and headaches with some aspects consistent with migraines. Brende's symptoms include tingling of the left arm and leg; dysphagia; numbness; hypersensitivity to light and sound; impaired cognition; headaches; weakness; fatigue; malaise; and a limited ability to sit, stand, walk, and carry objects.

The physicians who have treated and examined Brende, including those who did so at Reliance's request, have repeatedly denied that her impairments are psychological. Instead, the weight of the evidence indicates that Brende is debilitated from neurological impairments that are not mental or nervous conditions. Those neurological impairments are physically debilitating, as evidenced by both objective markers and by Brende's consistent and credible subjective complaints. As such, Brende was and remains incapable of performing the material and substantial duties of her regular occupation.

While an abuse of discretion standard of review applies to ERISA disability cases, that standard does not require the Court to affirm a decision made on a mere articulable basis alone. Additionally, Reliance is not only a party to an agreement, but also a fiduciary of an employee benefit plan. The record demonstrates that Reliance's decision was unreasonable and not supported by substantial evidence. Brende accordingly seeks the reversal of Reliance's decision.

I.      **MEDICAL PROFESSIONAL REFERENCE TABLE**

For the Court's reference, the following table depicts the medical professionals who offered their opinion about Brende's conditions, impairments, and resulting limitations.

| Physician | Relationship to Claim | Considered by Reliance in Initial Decision | Considered by Reliance in Final Decision | Not Considered by Reliance at Any Stage |
|---|---|---|---|---|
| Dr. Arthur Allen, M.D. | Brende's neurologist | X | X | |
| Dr. Jeanne Drisko, M.D. | Brende's integrative health physician & radiologist | | X | |
| Dr. Scott Jones, D.O. | Brende's psychiatrist[1] | | | X |
| Dr. Koko Husain, D.C. | Brende's chiropractor | | | X |
| Dr. Jeffrey Kaplan, M.D. | Reliance's neurologist | | X (basis for denial) | |
| Dr. Edwin Levy, M.D. | Reliance's psychiatrist | | X | |
| Dr. Francis Bellino, M.D. | Reliance's family medicine physician (review of file; no personal consultation) | X | X (basis for denial) | |

---

[1] Brende sought a consultative exam with Dr. Jones only as a result of Reliance's characterization of her conditions as mental or nervous disorders and as having a psychogenic origin.

II.     **STATEMENT OF FACTS**

1.  Kelly Dean Brende ("Brende"), born November 23, 1965, has been employed as a
    partner with Swanson Midgley, a law firm, since 2005.[2]

2.  Swanson Midgley provided its employees with a long term disability ("LTD")
    insurance policy (Policy Number: LTD 115875). Reliance Standard Life
    Insurance ("Reliance") administers that policy.[3]

3.  Because Brende was a partner in the firm engaged in a non-hazardous occupation
    who functioned primarily in an office environment, the policy classified her as a
    Class 1 employee.[4]

4.  For Class 1 employees, the policy defines "Total Disability" to mean:

    > "that as a result of an Injury or Sickness, during the Elimination Period and thereafter
    > for which a Monthly Benefit is payable, an Insured cannot perform the material and
    > substantial duties of his/her Regular Occupation.
    >
    > In addition, during the Elimination period and while a Monthly Benefit is payable,
    > Total Disability means that as a result of an Injury or Sickness an Insured is capable
    > of performing the material and substantial duties of his/her Regular Occupation on a
    > part-time basis or some of the material and substantial duties on a full-time basis."[5]

5.  The policy defines "Sickness" to mean "illness or disease causing Total Disability
    which begins while insurance coverage is in effect for the Insured. [. . .]"[6]

6.  On September 12, 2012, Brende experienced a numbing and tingling sensation on
    the left side of her body. Also feeling dizzy, she visited St. Luke's South

---

[2] Administrative Record ("AR") 839.
[3] AR 1.
[4] AR 9.
[5] AR 12.
[6] Id.

Emergency Department.[7]

7. Brende did not return to work the next day. Her last day of full-time employment was September 12, 2012.[8]

8. On September 14, 2012, Brende sought further care at St. Luke's Medical Group Southridge.[9]

9. On September 25, 2012, Brende visited neurologist Dr. Arthur Allen, M.D. of Shawnee Mission Neurology Consultants. Brende remained under Dr. Allen's care throughout the pendency of her claim. He reported that left hemi sensory dysfunction was responsible for Brende's numbness, tingling, and sensory perversion. He also assessed her with fatigue and malaise. He opined that her symptoms were subcortical and possibly thalamic.[10]

10. From November 27 to November 29, 2012, Brende underwent evaluation from the Mayo Clinic's Dr. Joseph Matsumoto, M.D.[11]

11. Dr. Matsumoto diagnosed Brende with numbness and weakness of an uncertain cause.[12]

12. On or about December 13, 2012, following the policy's 90 day waiting period, Brende submitted to Reliance her LTD benefits application.[13]

13. On February 22, 2013, Reliance approved Brende's application for LTD

---

[7] AR 787-91; 796; 814-820.
[8] AR 168.
[9] AR 785-86.
[10] AR 1041-43.
[11] AR 772-783.
[12] AR 782.
[13] AR 38; 72; 89; 98; 833-36.

benefits.[14]

14. On June 27, 2013, Brende visited Dr. Jeanne Drisko, M.D. at the University of Kansas Medical Center Integrative Health Department. Dr. Drisko diagnosed Brende with a probable vitamin deficiency and a methylation disorder. Dr. Drisko also noted that Brende likely experienced a hypothalamic-pituitary-adrenal axis dysfunction.[15]

15. Because Brende's symptoms did not abate, she continued to meet with Dr. Allen and Dr. Drisko at regular intervals throughout 2013 and 2014.[16]

**Reliance's Review of Brende's Benefits**

16. On December 31, 2013, Barbara Finnegan, R.N. reviewed Brende's file to assess her continuing eligibility for LTD benefits. Finnegan found that "[t]here is a degree of neurological impairment, but there is ability to carry out most activities of daily living as well as pre-morbid state. Lack of consistent work function remains supported [. . .]" Reliance approved Brende's benefits through July 1, 2014.[17]

17. On June 5, 2014, Dorothy McGarry, R.N. reviewed Brende's file to assess her continuing eligibility for LTD benefits. McGarry concluded that "lack of consistent work function is supported ongoing." McGarry also opined that there "appears to be a psychogenic contribution to her impairment since the date of loss, and ongoing."[18]

---

[14] AR 356.
[15] AR 537.
[16] AR 495-528; AR 534-607; AR 682-687; AR 1041-43; AR 1086-1090; AR 1137-1208.
[17] AR 169-70.
[18] AR 170-71.

18. On July 14, 2014, Dr. Francis Bellino, M.D. conducted, at Reliance's request, a review of Brende's medical records. He diagnosed her with skin sensation disturbances, malaise, fatigue, and anxiety. He concluded that her symptoms had no physiologic or anatomic basis. Dr. Bellino further commented that there was no evidence of cognitive impairment and that she could perform a non-physically demanding occupation. He also stated that it was "plausible that [a] mental nervous condition is the underlying cause of her condition." Finally, Dr. Bellino expressed doubt about Dr. Drisko's methods.[19]

19. On October 20, 2014, Reliance informed Brende that it would not continue paying Brende benefits beyond December 10, 2014. In that denial letter ("Initial Denial Letter") Reliance relied on Dr. Bellino's review and found Brende's conditions to be mental or nervous in nature.[20]

20. In characterizing her conditions as mental or nervous, Reliance invoked a part of the policy prohibiting payment of benefits beyond 24 months for "Mental or Nervous Disorders." That provision of the policy states:

> "MENTAL OR NERVOUS DISORDERS: Monthly Benefits for Total Disability caused by or contributed to by mental or nervous disorders will not be payable beyond an aggregate lifetime maximum duration of twenty-four (24) months unless the Insured is in a Hospital or Institution at the end of the twenty-four (24) month period. The Monthly Benefit will be payable while so confined, but not beyond the Maximum Duration of Benefits. [. . .]
>
> Mental or Nervous Disorders are defined to include disorders which are diagnosed to include a condition such as:
> (1) bipolar disorder (manic depressive syndrome);
> (2) schizophrenia;
> (3) delusional (paranoid) disorders;
> (4) psychotic disorders;

---

[19] AR 1048.
[20] AR 456-59.

(5) depressive disorders;
(6) anxiety disorders;
(7) somatoform disorders (psychosomatic illness);
(8) eating disorders; or
(9) mental illness."[21]

**Brende's Appeal of Reliance's Initial Denial**

21. Brende timely appealed Reliance's Initial Denial. In its January 16, 2015 letter to
    Brende, Reliance acknowledged receipt of her timely appeal.[22]

22. On February 17, 19, and 20, Brende sought a consultation from psychiatrist Dr.
    Scott Jones, D.O. She did so as a consequence of Reliance's Initial Denial Letter.
    Dr. Jones concluded that Brende was "psychologically doing very well" and did
    not need psychiatric care. He instead recommended continued neurological
    treatment with Dr. Allen.[23]

23. On February 25, 2015, Brende, through counsel, wrote to Reliance. In that letter,
    Brende provided Dr. Jones' opinion letter and a page detailing Dr. Drisko's
    professional credentials.[24]

24. Reliance instructed Brende to undergo an examination with neurologist Dr.
    Jeffrey Kaplan, M.D. On April 15, 2015, Dr. Kaplan conducted a sensory
    examination, finding that Brende experienced left side weakness and numbness.
    He also diagnosed her with skin sensitivity possibly consistent with allodynia,
    dizziness, and headaches.[25]

25. Dr. Kaplan opined that Brende was capable of performing full-time sedentary

---

[21] AR 24.
[22] AR 461.
[23] AR 1010-12.
[24] AR 1004-1014.
[25] AR 955.

work.[26]

26. On April 29, 2015, Dr. Koko Husain, D.C. provided to Reliance her written

   opinion of Brende's conditions. Dr. Husain opined that Brende had brachial

   neuritis, thoracic outlet aggravation, and perhaps a subtle form of Guillain-Barre

   Syndrome. Dr. Husain also commented on Brende's blood tests that displayed a

   mutation causing decreased methylation, anemia, vitamin deficiencies, and

   possible adrenal fatigue.[27]

27. On May 6, 2015, Dr. Allen offered an opinion letter detailing his experience with

   Brende. He offered four diagnoses: (1) numbness and tingling of the left arm and

   leg; (2) fatigue/malaise; (3) headache; and (4) dysphagia. He opined that an

   abnormality in her central nervous system and either the right subcortical white

   matter or thalamus were responsible for her symptoms.[28]

28. Reliance instructed Brende to undergo an examination with psychiatrist Dr.

   Edwin Levy, M.D. In a May 9, 2015 evaluation, Dr. Levy concluded that Brende

   was not in need of psychiatric care. [29]

29. Dr. Levy opined that her work limitations appeared to be the consequence of a

   neurological impairment. He opined that in the workplace she could not move fast

   or through complexities and interruptions.[30]

30. On July 22, 2015, Brende wrote a detailed letter to Reliance. In that letter, she

---

[26] AR 956.
[27] AR 979-80.
[28] AR 974-75.
[29] AR 963-971.
[30] AR 971.

responded to parts of Dr. Kaplan's assessment.[31]

31. In July 2015, Reliance paid Marshall Investigative Group ("the Group") to surveil and investigate Brende. On August 6, 2015, at the end of its investigation, the Group provided Reliance a summary of its observations. That summary stated that Brende did not leave her home for the three days for which she was surveilled.[32]

32. On September 11, 2015, Reliance issued to Brende a letter denying her appeal ("Final Denial Letter").[33]

33. In its Final Denial Letter, Reliance found that Brende's condition was not physically impairing and that it was caused by or contributed to by a Mental or Nervous Disorder.[34] In support, Reliance contended that "[s]ensory change on the left side of her body are subjective and cannot be reliably confirmed. No neurologic disorder has been identified to explain her symptoms. The record reveals that Ms. Brende is able to care for her three children, prepare meals and attend school functions."[35] Reliance also alleged that Brende retained strength and coordination in her extremities.[36]

34. In its Final Denial Letter, Reliance further maintained that it was justified in invoking the policy's Mental or Nervous Disorder provision. It argued that Dr. Drisko indicated that Brende's condition was related to stress.[37] Reliance interpreted Dr. Levy's findings to mean that Brende was limited by a lack of

---

[31] AR 918-20.
[32] AR 881-893.
[33] AR 473-90.
[34] AR 871.
[35] AR 874.
[36] AR 875.
[37] AR 876.

stamina.[38]

35. On November 30, 2015, Brende brought this cause of action.[39]

## III.    **APPLICABLE LAW**

### a.   **Summary Judgment Standard**

Summary judgment is appropriate when the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998) (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id. (citing Anderson*, 477 U.S. at 248). Summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (*quoting* Fed. R. Civ. P. 1).

### b.   **Standard of Review**

In a cause of action brought pursuant to ERISA, the proper standard for reviewing that decision is an "arbitrary and capricious" standard of review if the insurance policy gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits. *Firestone*

---

[38] AR 876.
[39] ECF #1.

*Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989). The arbitrary and capricious standard requires the court to determine whether the claim administrator's decision was both reasonable and made in good faith. *Phelan v. Wyoming Associated Builders*, 574 F.3d 1250, 1256 (10th Cir. 2009) (citations omitted). Lack of substantial evidence, mistake of law, and bad faith are considered indications of arbitrary and capricious decisions. *Finley v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 379 F.3d 1168, 1176 (10th Cir. 2004). Evidence is substantial if a reasonable mind might accept it as adequate to support the conclusion reached by the decision maker. *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002).

When an insurer doubles as the plan administrator, "there is an inherent conflict of interest between its discretion in paying claims and the need to stay financially sound." *Adamson v. UNUM Life Ins. Co. of America*, 455 F.3d 1209, 1213 (10th Cir. 2006) (*citing Pitman v. Blue Cross & Blue Shield of Okla.*, 217 F.3d 1291, 1296 n. 4 (10th Cir. 2000). If a plan gives discretion to an administrator who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there was an abuse of discretion. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S.101, 115 (1989).

Additionally, where the fiduciary acts under a financial conflict of interest, the court must account for the conflict when determining whether the fiduciary, substantively or procedurally, has abused its discretion. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008). Its weight as a factor depends on the seriousness of the conflict. *Foster v. PPG Industries, Inc.*, 693 F.3d 1226, 1232 (10th Cir. 2012). Accounting for *Metro. Life Ins. Co. v. Glenn*, the Tenth Circuit "crafted a sliding scale approach where the reviewing court will always apply an arbitrary and capricious standard, but will decrease the level of deference given in proportion to the seriousness of the

conflict." *Weber v. GE Grp. Life Assur. Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008) (internal citations, modifications, and quotations omitted).

Additionally, 29 U.S.C. § 1132(a)(3)  authorizes a cause of action for breach of fiduciary duty. *Varity Corp. v. Howe*, 516 U.S. 489 (1996); *Moore v. Berg Enterprises., Inc.*, 201 F.3d 448, 449 n. 2 (10th Cir. 1999). The fiduciary obligations under ERISA are "the highest known to the law." *LaScala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007). A benefit determination is "a fiduciary act (i.e., an act in which the administrator owes a special duty of loyalty to the plan beneficiaries)." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008). Under trust principles, a deferential standard of review is appropriate when fiduciaries "exercise a discretionary power vested in them by the instrument under which they act." *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1315 (10th Cir. 2009) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989)).

The appropriate standard of review in this case turns on language found in Brende's group LTD insurance policy provided by Swanson Midgley. The policy states:

> "Reliance Standard Life Insurance Company shall serve as the claims review fiduciary with respect to the insurance policy and the Plan. The claims review fiduciary has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits Decisions by the claims review fiduciary shall be complete, final and binding on all parties."[40]

This grant of authority appears sufficient to confer discretion upon Standard in the application of the policy to Brende's claim.

---

[40] AR 16.

## IV.   <u>ARGUMENT</u>

Brende is entitled to judgment as a matter of law. While the arbitrary and capricious standard affords Reliance discretion in the determination of Brende's eligibility for LTD benefits, Reliance abused that discretion in several ways. Reliance acted unreasonably, arbitrarily, capriciously in its decision to terminate Brende's LTD benefits.

### A.  Reliance unilaterally and improperly added an objective medical evidence requirement into the policy.

In its Final Denial Letter, Reliance justified its denial because Brende's "[s]ensory change on the left side of her body are subjective and cannot be reliably confirmed. No neurologic disorder has been identified to explain her symptoms."[41] By requiring objective medical evidence of Brende's symptoms and conditions, Reliance terminated her benefits pursuant to a condition that was not present in the policy.

The policy defines "Total Disability" to mean:

> "that as a result of an Injury or Sickness, during the Elimination Period and thereafter for which a Monthly Benefit is payable, an Insured cannot perform the material and substantial duties of his/her Regular Occupation.
>
> In addition, during the Elimination period and while a Monthly Benefit is payable, Total Disability means that as a result of an Injury or Sickness an Insured is capable of performing the material and substantial duties of his/her Regular Occupation on a part-time basis or some of the material and substantial duties on a full-time basis."[42]

Absent from the definition of Total Disability is language regarding the insured's need to present objective medical evidence of symptoms. Nor does the policy define "Sickness" in a way that requires objective medical evidence of symptoms: "'Sickness' means illness or disease causing Total Disability which begins while insurance coverage is in effect for the Insured. [. .

---

[41] AR 478.
[42] AR 12.

.]"[43] Nor does the policy's Mental or Nervous Disorders provision require objective medical evidence of symptoms.

Reliance unilaterally devised and imposed on Brende the objective medical evidence requirement. However, a plan administrator may not reasonably demand objective medical evidence of a condition which is incapable of objective diagnosis. In *Swanson v. Unum Life Ins. Co. of Am.*, No. 13-CV-4107-JAR, 2015 WL 339313, at *9 (D. Kan. Jan. 26, 2015), this Court distinguished the unreasonable request for objective medical evidence of a condition which is incapable of objective diagnosis from the reasonable request for objective evidence that a claimant's diagnosed condition renders her unable to perform her occupational duties.

Here, Reliance improperly required objective evidence of Brende's neurological symptoms and puzzling neurological condition itself. Indeed, this is because Brende's physicians had in fact already supplied objective evidence that Brende could no longer perform her duties as an attorney. More importantly, Dr. Levy, the psychiatrist Reliance ordered Brende to visit, conducted a Global Assessment of Functioning exam. He opined:

> "Her inability to function in a work environment is caused by the undiagnosed syndrome. Judgments regarding work limitation would be best made by her neurologist. However, she is not able to move fast and where she needs to go through complexity after complexity and interruption after interruption. [. . .]
>
> The patient tires very easily, needs continually to rest after effort in daily life tasks, perceives herself as weak, is in several different kinds of pain including paresthesias, gets dizzy and aches. These greatly limit her ability to do more than basic activities of living and much of the care of her children and maintaining a relationship with her husband."[44]

In light of *Swanson v. Unum Life Ins. Co. of Am.*, Reliance's failure to account for Dr. Levy's GAF score is particularly problematic. Likewise, Dr. Allen supplied Reliance with an assessment outlining Brende's precise limitations. He opined that she could sit for one to three hours daily,

---

[43] Id.
[44] AR 971.

drive for one to three hours daily, stand for no part of the day, and walk for no part of the day. He also opined that she could not use her left upper extermities for simple grasping, pushing, pulling, and fine manipulation. He opined that she could lift and carry no weight. He also found that she was moderately limited in her ability to perform complex and varied tasks.[45] Reliance not only unreasonably required objective evidence of Brende's conditions, but it also ignored the existing objective evidence that she was incapable of performing her work duties.

Whatever the cause of Brende's condition may be, all medical professionals agree that she is impaired. As held in *Cavaretta v. Entergy Corp. Companies' Benefits Plus Long Term Disability Plan*, No. CIV.A. 03-1830, 2004 WL 2694895, at *10 (E.D. La. Nov. 23, 2004), this practical consideration is paramount:

> "Hartford focuses upon the gray areas in the medical reports where the doctors are not 100% certain whether Cavaretta has a specific diagnosis or not, but Hartford avoids the concrete and substantial evidence of the treating physicians that continually report severe problems in Cavaretta's physical and mental health."

Courts have drawn similar conclusions in other cases involving similarly difficult illnesses. For example, courts have prevented insurers from demanding unobtainable objective evidence from claimants suffering from chronic fatigue syndrome ("CFS"). While it is not clear whether Brende is afflicted with CFS, the reasoning employed by courts in those cases applies in full here. In *Karvelis v. Reliance Standard Life Ins. Co.*, No. CIV.A. H-03-3848, 2005 WL 1801943, at *12 (S.D. Tex. July 28, 2005), the court provided an instructive summary of cases on this subject:

> "In *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433 (3d Cir.1997), the court discussed a frequent issue in CFS cases. In that case, the court held that it was *prima facie* unreasonable to require claimants with CFS to submit objective evidence of their condition, given that there are no recognized objective physical tests and that the CFS diagnosis is one of exclusion. A number of courts have adopted this approach. *See Cook v. Liberty Life Assur. Co.*, 320 F.3d 11, 21-22 (1st Cir.2003); *Hawkins v. First Union Corp. LTD Plan*, 326 F.3d 914, 919 (7th Cir.2003) (Posner, J.); *Friedrich v. Intel Corp.*, 181 F.3d 1105, 1112 (9th Cir.1999); *Burchill v. Unum Life Insur. Co. of Am.*, 327 F.Supp.2d 41, 51 (D.Me.2004); *Pralutsky v. Met. Life Insur. Co.*,

---

[45] AR 764-65.

316 F.Supp.2d 840, 852-53 (D.Minn.2004); *Maronde v. Sumco USA Group Long-Term Disability Plan,* 322 F.Supp.2d 1132, 1139 (D.Or.2004); *Sansevera v. E.I. DuPont de Nemours & Co.,* 859 F.Supp. 106, 113 (S.D.N.Y.1994). These courts have recognized that an insurer cannot insist on a standard of proof for proving disabling CFS that effectively eliminates the possibility of anyone with CFS actually receiving long-term disability benefits."

Finally, an insurer's denial may not be based on terms that are not a part of the original policy between the parties. Insurers commonly include limitations against self-reported and subjective symptoms. The absence of such a limitation here suggests that it was not contemplated. *See Barone v. Unum Life Ins. Co. of America,* 186 F. Supp. 2d 777, 786 (E.D. Mich. 2002) (Plaintiff entitled to disability benefits despite lack of objective findings, in part because plan did not define a disability as one that must be supported with objective findings).

Reliance's subsequent addition of this extra-contractual language rendered the decision-making process improper. *See Duncan v. Continental Casualty Co.*, 1997 WL 88374 at *5 (N.D. Cal. February 10, 1997) ("[The Defendant] cannot exclude a claim for lack of 'objective medical evidence' unless the 'objective medical evidence' standard was made 'clear, plain and conspicuous enough [in the policy to negate layman [plaintiff's] objectively reasonable expectations of coverage.' The 'objective medical evidence' standard first appeared in correspondence between the parties and is not found in the original policy document. As such, [the Defendant] may not seek to deny [Plaintiff's claims based on standards not within the policy itself."); s*ee also Durr v. Metropolitan Life Ins. Co.*, 15 F.Supp.2d 205, 212 (D. Conn. 1998) (internal citations omitted) ("We find that defendant's denial was arbitrary and capricious because administrators and fiduciaries are prohibited from adding a term or extra requirement into an insurance policy that is not expressly part of it. This action alone would support a finding that a fiduciary has acted arbitrarily and capriciously.").

In conclusion, Reliance's decision to terminate benefits due to an absence of objective medical evidence was therefore both unreasonable and arbitrary and capricious. It was unreasonable in that it required objective evidence of a condition incapable of being tested objectively, and because it ignored the existing objective evidence of her work limitations and restrictions. In unilaterally imposing on Brende a condition that was not present in the policy, Reliance's decision was arbitrary and capricious.

### B.  Reliance improperly invoked the policy's Mental or Nervous Disorder limitation.

Brende's impairments and condition have puzzled many physicians. While she displays symptoms that suggest neurological abnormality, tests have not confirmed any common or identifiable neurological disease. Although Reliance initially acknowledged the neurological nature of her condition, upon the arrival of an opportunity to terminate the payment of benefits under the Mental or Nervous Disorder limitation of the policy, it attempted to characterize her impairments as psychological or psychosomatic. Reliance first adopted this position in its Initial Denial Letter.[46]

However, there has never existed evidence of a psychological or psychosomatic illness. As a result, Reliance supplemented its rationale in its Final Denial Letter by arguing that, regardless of the nature of Brende's condition, she was not actually impaired to a degree that prevented her from performing a sedentary occupation.[47]

Significantly, Reliance's mischaracterization of Brende's condition preceded its Initial Denial Letter. Reliance's internal communications revealed its early mischaracterization of the nature of Brende's condition. A May 29, 2014 note by a Reliance employee requested an

---

[46] AR 456-58.
[47] AR 478.

evaluation to "determine if [the] primary diagnosis is still migraine or if there are physical ailments."[48] This characterization of Brende's condition illustrates that Reliance commenced its review with an unjustifiably mistaken notion of Brende's medical diagnoses. Brende's medical records did not state that migraine headaches were the primary cause of her limitations. Rather, Dr. Allen and Dr. Drisko each provided detailed reports explaining the sensory dysfunction, fatigue, weakness, and dizziness that Brende experienced.[49]

Moreover, Reliance's implication that Brende did not suffer from "physical ailments" is not supported by the evidence. Each of Brende's physicians documented her physical decline. They did not note mental or psychological ailments. Furthermore, no physician who has examined Brende has referred her to a psychiatrist. Dr. Levy brought attention to this important detail in his Reliance-ordered examination of Brende.[50]

Brende relied primarily on Dr. Allen, a neurologist, and Dr. Drisko, the director of the University of Kansas' Department of Integrative Medicine. Dr. Drisko was certified in radiology, nutrition, and chelation therapy.[51] Brende did not seek treatment for her conditions from psychiatrists or psychologists. Only after Reliance's mischaracterization of her conditions and at Reliance's request did she meet with psychiatrists Dr. Jones and Dr. Levy.

In its Final Denial Letter, Reliance relied heavily on Dr. Bellino's July 14, 2014 review of Brende's conditions. Reliance pointed to Dr. Bellino's conclusion that Brende's "symptoms have no explanation in a physiologic or an anatomic basis."[52] However, Dr. Bellino's review of Brende's file misinterpreted and altogether failed to account for numerous medical records. Dr.

---

[48] AR 277.
[49] AR 534-607; 618-22; 667-79; 682-87.
[50] AR 966.
[51] AR 1027.
[52] AR 476.

Bellino's synopsis, for example, indicates that Brende suffered from anxiety.[53] However, in the report that follows, he does not recite this diagnosis and makes no effort to substantiate its presence in the synopsis. Moreover, Dr. Bellino either failed to fully review or completely discounted Brende's progress notes with Dr. Drisko. Those notes state that Brende "does not feel like she has anxiety."[54] Dr. Bellino's error regarding anxiety might be excusable, but Reliance's Final Denial Letter simply mirrored Dr. Bellino's synopsis without any further discussion.[55] Its reliance on that naked conclusion was unwarranted and is one of several examples reflecting the low degree of attention paid to Brende's actual conditions.

Furthermore, as noted by Dr. Levy, both Reliance's and Dr. Bellino's motives for adopting an anxiety diagnosis are suspect. [56] Dr. Levy, in referencing Brende's letter to Reliance (offered by counsel Erin Fox), wrote:

> "As Disability Attorney Erin Fox points out, the company gave Dr. Bellino some misinformation. He also says the Company originally adjudicated her as 'nervous and mental.' There is no documentation offered or referred to in support of this. Such an assertion would not seem acceptable without documentation. His comments regarding 'fatigue' and 'stressful year', for example would seem to indicate he was searching for support for a psychiatric diagnosis."[57]

Given that Reliance sought Dr. Levy's evaluation of Brende, his assessment strongly supports the notion that Reliance breached its fiduciary duty of loyalty to Brende in administering her benefits.

Additionally, Dr. Bellino discounted and ignored Dr. Drisko's findings. Dr. Bellino remarked that Dr. Drisko "provided no evidence for [a physical] crash" and that Brende's

---

[53] AR 1044.
[54] AR 1186.
[55] AR 476.
[56] AR 964-65.
[57] AR 964.

"symptoms have no explanation in a physiologic or an anatomic basis."[58] As with Dr. Bellino's conclusion that Brende suffered from anxiety, Dr. Bellino's conclusions about a physical crash and physiologic and anatomic bases for Brende's conditions are significant in that Reliance imported them into its Final Denial Letter.[59]

Dr. Bellino's opinions, however, are inconsistent with Brende's medical records. For example, evidence of a crash appeared in Brende's medical records after Dr. Drisko conducted tests revealing that Brende's adrenal panel and neurotransmitter panels were abnormal.[60] Dr. Drisko also diagnosed Brende with hormone imbalances, a methylation disorder, and vitamin deficiencies.[61] Dr. Bellino also makes his skepticism of Dr. Drisko clear. He characterizes her as a complementary and alternative doctor.[62] As explained by the National Institutes of Health, integrative medicine is not merely complementary and alternative medicine: "There are many definitions of 'integrative' health care, but all involve bringing conventional and complementary approaches together in a coordinated way."[63] Dr. Bellino's error prompted Brende's responsive letter that provided Dr. Drisko's complete credentials.[64] Those credentials included director of the University of Kansas' Integrative Medicine Department, Endowed Professor of Orthomolecular Medicine, Board Certification in diagnostic radiology, certification as a nutrition specialist by the American College of Nutrition, and certified in chelation therapy. Reliance nevertheless failed to address Dr. Bellino's mischaracterization.

Finally, even Dr. Bellino at one point appeared to acknowledge a physiological or

---

[58] AR 1046.
[59] AR 476.
[60] AR 1139.
[61] AR 1140.
[62] AR 1046.
[63] https://nccih.nih.gov/health/integrative-health
[64] AR 1013-1014.

anatomical dimension to Brende's condition: "It is of interest that following a laparoscopic cholecystectomy Ms. Brende found her symptoms to have improved for a short period of time."[65] However, Dr. Bellino did not elaborate on his interest on that potential relationship. Indeed, it is the inability to define the precise etiology of Brende's symptoms that contributes to the severity, complexity, and duration of her impairments. Because the course and longevity of Brende's sickness are puzzling, treatment remains elusive.

In summary, Reliance adopted an inaccurate and unfounded position about Brende's psychological state in its Initial Denial Letter. That position originated in Reliance's internal notes while Brende was receiving benefits. Reliance maintained that position due to Dr. Bellino's misguided interpretation of records provided by Brende's treating physicians – none of whom found Brende to be experiencing any mental or nervous disorder. To the contrary, the evidence demonstrated several physical bases for her conditions. Consequently, Dr. Bellino's opinion was not supported by substantial evidence, and Reliance's heavy emphasis on his opinion was unreasonable. Moreover, as explained by Dr. Levy, Dr. Bellino's opinion strongly suggests that Reliance breached its fiduciary duty of loyalty.

**C. Reliance lacked substantial evidence in making its determination that Brende could perform her Regular Occupation.**

In addition to its application of the Mental or Nervous Disorder provision, Reliance also justified its termination of benefits by finding that she was capable of performing her Regular Occupation as an attorney. In its Final Denial Letter, Reliance concluded that Brende's limitations and restrictions did not physically preclude her from working as an attorney:

> "Based on a review of Ms. Brende's complete file, we have determined that her physical conditions would not prevent her from performing work function. Ms. Brende is capable of performing her Regular Occupation as an attorney, which is classified as a sedentary exertion

---

[65] AR 1046.

level occupation.

> In order to qualify for continuing LTD benefits, the medical evidence must show that [Brende's] conditions would not prevent her from performing her Regular Occupation. [Brende] must show that the symptoms from [her] condition are in fact disabling, in accord with the terms of the Policy. The record reveals that Ms. Brende has full bulk and strength in all 4 extremities with normal tone. Sensory change on the left side of her body are subjective and cannot be reliably confirmed. No neurologic disorder has been identified to explain her symptoms. The record reveals that Ms. Brende is able to care for her three children, prepare meals, and attend school functions. [. . .]

> Although Ms. Brende's physician's [sic] ascribe restrictions and limitations to Ms. Brende, the medical evidence does not support the presence of a neurological condition that would warrant work restrictions and limitations from a physical standpoint."[66]

Reliance's conclusion, however, failed to account for each of her Regular Occupation's requirements. Those requirements (tasks, demands, and aptitudes) are detailed by Reliance in its Occupational Data document.[67] In fact, neither Reliance nor its independent medical examiners found that Brende could perform her Regular Occupation as an attorney. Rather, they addressed only its physical requirements.

However, Reliance's own Occupational Data document specifies non-physical tasks, demands, and aptitudes. These non-physical requirements are material and substantial to her Regular Occupation. Tasks include conducting research, client contact, preparing written legal argument, preparing for trial, and interpreting law.[68] Although listed as a physical demand, Brende's occupation also requires frequent near acuity.[69] It also requires aptitudes above the 89th percentile in general learning ability, verbal aptitude, and numerical aptitude. Spatial aptitude, form perception, clerical aptitude, motor coordination, finger dexterity, and manual dexterity are required at lower percentiles.[70]

---

[66] AR 478.
[67] AR 767-69.
[68] AR 767.
[69] AR 768.
[70] AR 768.

Reliance failed to address these material and substantial duties in its Final Denial Letter. Its failure in this regard renders its decision unreasonable. *See Audino v. Raytheon Co. Short Term Disability Plan*, 129 F. App'x 882, 885 (5th Cir. 2005) ("Neither MetLife nor its consultants analyzed specifically how Audino's conditions affected her ability to engage in each of those tasks or explained why her conditions did not prevent her from performing those tasks."); *Panther v. Sun Life Assur. Co. of Canada*, 464 F. Supp. 2d 1116, 1121 (D. Kan. 2006) ("Sun Life's May 11, 2006 decision to deny Ms. Panther long term disability benefits was unreasonable because it addressed only *one* of the material and substantial duties of her occupation.").

Additionally, Dr. Kaplan did not discuss the effect of Brende's non-physical impairments on her ability to perform her Regular Occupation. He opined that Brende's limitations do not "prevent her doing 'sedentary' work as described in this question set forth by Reliance Standard Life Insurance Company."[71] He formulated his opinion only on the basis of his assessment of her physical exertional abilities.[72] Notably, in that opinion, he did not conclude that Brende could work as an attorney.

The failure of Reliance and Dr. Kaplan to address the non-physical requirements of her Regular Occupation is particular problematic in light of the evidence documenting her non-physical impairments. While Brende's physical and neurological impairments were critical to her disability claim, her cognitive deficits were also disabling. As discussed in subsection A, Dr. Levy identified specific non-physical limitations in the process of assessing a GAF score:

> "Her inability to function in a work environment is caused by the undiagnosed syndrome. Judgments regarding work limitation would be best made by her neurologist. However, she is not able to move

---

[71] AR 914.
[72] AR 913.

fast and where she needs to go through complexity after complexity and interruption after interruption. [. . .]

The patient tires very easily, needs continually to rest after effort in daily life tasks, perceives herself as weak, is in several different kinds of pain including paresthesias, gets dizzy and aches. These greatly limit her ability to do more than basic activities of living and much of the care of her children and maintaining a relationship with her husband."[73]

Reliance and Dr. Kaplan similarly failed to account for Dr. Allen's notes regarding Brende's non-physical limitations. Dr. Allen noted, for example, that Brende's "[t]riggers include bright light, loud noises and additional commotion. She remains unable to screen or filter ambient activity (similar to a migraineur). There is visual blurring and recurrent left hemicranial headaches which localize behind the left eye."[74] Dr. Allen further supplied Reliance with an assessment outlining Brende's precise limitations. He opined that she could sit for one to three hours daily, drive for one to three hours daily, stand for no part of the day, and walk for no part of the day. He also opined that she could not use her left upper extermities for simple grasping, pushing, pulling, and fine manipulation. He opined that she could lift and carry no weight. He also found that she was moderately limited in her ability to perform complex and varied tasks.[75]

Reliance and Dr. Kaplan's conclusions as to Brende's ability to perform her Regular Occupation failed to account for all of her limitations. Those limitations prevented her ability to perform the material and substantial duties of her occupation. In particular, she was not capable of performing the tasks, demands, and aptitudes required by her Regular Occupation as an attorney. Reliance's decision was therefore unreasonable and not supported by substantial evidence.

---

[73] AR 971.
[74] AR 1087.
[75] AR 764-65.

**D.  Reliance acted unreasonably in giving no weight to the video surveillance evidence and its corroborative effect on Brende's subjective complaints.**

Reliance conducted extensive surveillance, investigation, and a background search on Brende.[76] In July 2015, Reliance paid Marshall Investigative Group ("The Group") over $3,000 for a variety of investigative services. The Group surveilled Brende's residence for three days. The Group also obtained information about Brende from sources that were familiar with her personally, investigated Brende's presence and activity online, investigated Brende's presence and activity in the community, and searched Brende's personal history and background. Following its investigation, the Group compiled a lengthy report for Reliance.[77]

The Group's comprehensive and detailed investigation revealed no evidence that was inconsistent with Brende's disability. Indeed, Reliance elected to forego including any of the Group's findings in its Final Denial Letter. In fact, the Group's investigation corroborates Brende's disability claim. For example, during the Group's three day surveillance of Brende's residence, it reported that Brende remained inside her home for the entire period of surveillance. While the Group confirmed on each day that Brende was inside, it reported that she was "unfortunately not observed at any time during the surveillance."[78] Brende's inactivity is particularly remarkable given that the Group surveilled Brende on a Friday, Saturday, and Sunday and because Brende is the mother of three young children.

Reliance failed to indicate to what extent it considered its video surveillance evidence of Brende and Brende's credibility with respect to her subjective complaints and self-reported symptoms. Although Reliance surveilled Brende for three days, the record does not reflect the

---

[76] AR 881-903.
[77] AR 881-87.
[78] AR 882.

28

degree of weight Reliance afforded to its video footage. It further appears that Reliance altogether refused to consider Brende's subjective complaints as legally sufficient evidence.[79]

The combined effect of Reliance's omissions is significant in two respects. First, a plan administrator may not deny benefits simply because a condition is marked by subjective complaints. Second, Brende's subjective complaints and self-reported symptoms are particularly deserving of consideration because Reliance's surveillance footage fully corroborated her reports. As explained in *Schully v. Cont'l Cas. Co.*, 380 F. App'x 437, 439 (5th Cir. 2010) citing to *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834, (2003), a plan administrator may not arbitrarily refuse to consider subjective complaints:

> "The Hartford also failed to consider Schully's longstanding subjective complaints of pain, which were repeatedly corroborated by the physicians most familiar with his condition and which were consistent with the medical evidence. As we have often explained, there is no treating physician preference in the context of ERISA, but neither may an administrator *arbitrarily* refuse to credit reliable evidence."

The Group's surveillance is important in three additional ways. First, it conclusively demonstrated that Brende's life was significantly constrained by her condition. It is inconceivable that an intelligent and affluent 46 year old woman with three young children would remain indoors for three consecutive days unless she were afflicted with a serious condition. Surveillance evidence consistent with an individual's claim is relevant to the disability determination. *See, e.g. Garmon v. Liberty Life Assur. Co. of Boston*, 385 F. Supp. 2d 1184, 1200 (N.D. Ala. 2004); *Dieterich v. Hartford Life & Acc. Ins. Co.*, No. 2:10-CV-36, 2011 WL 2294167, at *10 (E.D. Tenn. Apr. 12, 2011), *report and recommendation adopted*, No. 2:10-CV-36, 2011 WL 2259124 (E.D. Tenn. June 8, 2011) (lengthy observation of claimant was relevant to insurer's decision). Here, however, Reliance offered no indication that it considered or gave

---

[79] AR 456-58; 473-81.

any weight to the Group's findings.

Second, Brende's sedentary and reclusive activity corroborates what Reliance, Dr. Bellino, and Dr. Kaplan continually characterized as subjective and unverified complaints. Third, Reliance did not make the Group's findings available to its reviewing physicians.[80] As a result, they were deprived of evidence that would have impacted their opinions. For example, Dr. Bellino's opinion was based on his belief that Brende was in fact traveling with her children, working, and regularly performing activities of daily living.[81] The Group's findings are strong evidence that Dr. Bellino's opinion was founded upon inaccurate beliefs.

Reliance's failure to consider the Group's surveillance footage demonstrates that its conclusion was unreasonable. As discussed in subsection E below, Reliance acted equally unreasonably in affording weight to the opinions of Dr. Bellino and Dr. Kaplan – rather than the opinions of Brende's treating physicians – despite the fact that the footage corroborated Brende's complaints.

### E. Reliance unreasonably afforded controlling weight to the exams conducted by Dr. Bellino and Dr. Kaplan.

Reliance acted unlawfully in its treatment of Brende's treating physicians' opinions. Reliance failed to adequately consider and discuss the opinions offered by Dr. Allen, Dr. Drisko, Dr. Jones, and Dr. Husain. More specifically, Reliance gave very little weight to the opinions of Dr. Allen and Dr. Drisko and altogether ignored the opinions of Dr. Jones and Dr. Husain. Moreover, Reliance ultimately ignored the findings of Dr. Levy, an independent psychiatrist to whom it ordered Brende to undergo evaluation.

---

[80] See AR 910 (list of records reviewed by Dr. Kaplan); AR 963 (list of records reviewed by Dr. Levy); AR 1045 (list of records reviewed by Dr. Bellino).
[81] AR 1047.

Although a claims administrator need not defer to a claimant's physicians' opinions, it is not entitled to arbitrarily refuse to credit those opinions. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, (2003). Circuit courts have held similarly. *See, e.g. Donovan v. Eaton Corp.*, 462 F.3d 321, 329 (4th Cir. 2006) (finding an abuse of discretion where there was a "wholesale disregard" of evidence in the claimant's favor); *Glenn v. Metro. Life Ins. Co.*, 461 F.3d 660, 672 (6th Cir. 2006) (emphasizing that "the failure to consider evidence that is offered after an initial denial of benefits renders a final denial of benefits arbitrary and capricious"); *Harris v. Holland*, 87 F. App'x 851, 859 (4th Cir. 2004) (holding that the trustee abused its discretion in denying plaintiff's claim for disability benefits, where it "apparently gave no consideration" to an opinion provided by a treating physician that directly addressed one of the issues in dispute).

A claims administrator's duty to consider a claimant's physicians' opinions continues even when the claims administrator obtains its own medical evidence. On this point, *Collins v. Cont'l Cas. Co.*, 87 F. App'x 605, 608 (8th Cir. 2004) is instructive. There, the opinion of the plan administrator's independent examiner was inadequate to constitute substantial evidence in light of the several opinions offered by the claimant's physicians: "Our review of the record, moreover, convinces us that the evidence overwhelmingly supported finding Collins disabled. No doctor suggested Collins was malingering or was not experiencing the degree of disability she reported, and four doctors stated she was experiencing disabling symptoms to a degree that rendered her unable to perform her job." *See also Morgan v. UNUM Life Ins. Co. of Am.*, 346 F.3d 1173, 1178 (8th Cir. 2003) (reviewing physician's opinion was not substantial evidence where the opinion was contrary to opinions of two primary treating physicians, and record did not show reviewing physician had expertise or experience with disability at issue).

First, in affording Dr. Bellino's opinion considerable weight, Reliance's decision was

unreasonable and unsupported by substantial evidence. At Reliance's request, Dr. Bellino, a

family medicine physician, reviewed Brende's medical records and submitted a report on July

14, 2014.[82] Dr. Bellino's opinion, made without personally examining Brende, stands contrary to

the opinions of treating physicians Dr. Allen, Dr. Jones, Dr. Drisko, Dr. Levy, and Dr. Housain.

In his review, Dr. Bellino found it plausible that a "mental nervous condition is the underlying

cause of her symptoms."[83] He further concluded that there was inadequate support for her

complaints of weakness and fatigue.[84]

Dr. Bellino's opinion also unreasonably discredited Dr. Allen's assessment of Brende's

ability to sustain activity. First, as previously argued, Dr. Bellino and Reliance ignored the

restriction assessment form supplied by Dr. Allen. Second, Dr. Bellino discounted clear

examples of Brende's lack of strength and stamina that appeared in Dr. Allen's notes. For

instance, Dr. Allen noted that Brende must pace herself when preparing meals, doing laundry,

and helping her children with schoolwork. He also noted that she could only pick her children up

from school when she felt up to it. He reported that going to her son's soccer games caused her

to be worn out for a week afterward.[85]

Dr. Allen concluded one report by stating that Brende was in no position to return to

work, as she was "having a great deal of difficulty balancing homemaker and mother."[86] He

commented that fatigue was a prominent symptom, "as even the most sedentary of activity drains

her of energy and requires rest to recuperate."[87] After briefly acknowledging the above

examples, Dr. Bellino found that Dr. Allen's statements about Brende's abilities were

---

[82] AR 1044-48.
[83] AR 1048.
[84] AR 1047.
[85] AR 1047.
[86] AR 1126.
[87] AR 621.

inconsistent with what Brende herself told Dr. Allen.[88] However, Dr. Bellino did not describe how or why Brende's apparent ability to engage in modest domestic activities – at infrequent intervals, with rest periods of one to three hours, and with the assistance of others – enabled her to return to full-time work. Furthermore, Reliance's implied comparison between Brende's daily activities and the requirements of a full-time job is misplaced. *See, e.g. Crespo v. Unum Life Ins. Co. of Am.*, 294 F. Supp. 2d 980, 996 (N.D. Ill. 2003) ("There is no evidence anywhere in the record that Crespo undertakes these activities with the regularity and structure of a full time job. Furthermore, there is no requirement on the disabled to become inert in order to avoid having their disability benefits denied.")

Additionally, because Dr. Bellino was not present during Brende's visits with Dr. Allen, Dr. Bellino questioned Dr. Allen's listening skills and ability to accurately interpret his patient's complaints. Dr. Bellino challenged Dr. Allen's opinion about Brende's limitations on the grounds that Dr. Allen's opinion was inconsistent with her actual activities. Given that Dr. Bellino's knowledge of Brende's actual activities came by way of Dr. Allen's notes, it is curious that Dr. Bellino would so confidently disregard the opinion of the physician who recorded those notes. Importantly, Dr. Allen's notes are consistent with those recorded by Dr. Drisko. Following a November 27, 2013 appointment, Dr. Drisko indicated that Brende "[c]ontinues with severe malaise and nonrestorative sleep. Unable to attend to activities of daily living."[89]

It is Dr. Bellino's opinion, rather than Dr. Allen's, that fails to reflect Brende's circumstances. Dr. Bellino simply asserts Brende's sporadic, limited, and exhausting efforts to participate in ordinary activities is evidence that she can sustain physical activity generally. In

---

[88] AR 1047-48.
[89] AR 1140.

fact, Dr. Bellino went even further, speculating that Brende's symptoms of numbness and tingling would not impair "*any* level of physical activity."[90] None of Reliance's other medical professionals (Dr. Kaplan, Dr. Levy, nor the nurses responsible for review) joined in that opinion.

In drawing his conclusion, Dr. Bellino omitted and ignored symptoms and manifestations of Brende's condition. Dr. Bellino did not comment or take into consideration the fact that, while Brende sometimes goes grocery shopping, she is sometimes unable to put them away.[91] He also failed to account for Brende's need for rest periods during the day, as well as her impaired balance and difficulty walking.[92] Moreover, Dr. Bellino failed to consider that Brende sometimes struggled with a task as simple as folding the laundry and that she found it difficult to navigate the stairs.[93] By August 2013, Brende had withdrawn from activities with her church and children's school.[94] In a note following a 50 minute exam on April 17, 2014, Dr. Allen states that Brende had "a great deal of difficulty balancing homemaker and mother" and was not prepared to also consider returning to work.[95]

Dr. Bellino also failed to consider Brende's sensitivities. Dr. Allen commented on this phenomenon on November 2, 2012: "She has developed sensitivity to loud sounds such as her son bouncing a basketball in the house or playing the trumpet (intensifies paresthesias), and recently during the night she got up and shaved her legs because the bedsheets were irritating the entire left lower extremity from rubbing against the stubble."[96] In response to the noise, she

---

[90] AR 1047 (emphasis added).
[91] AR 1124.
[92] AR 1124.
[93] AR 499.
[94] AR 500.
[95] AR 1089.
[96] AR 806.

would sometimes use ear plugs.[97] Likewise, Dr. Allen noted that she "has become sensitive to florescent light."[98] Her symptoms worsened to the point that she wore sunglasses indoors.[99]

Dr. Bellino overlooked this subject. His closest remarks were again dismissive: "It is unclear how Ms. Brende's sensory abnormalities play any role  in impairing her occupational function, since many of these secondary abnormalities are noted in parts of the body (face, thorax, leg), which do play a role in any occupation."[100] In short, Dr. Bellino's selective and flippant interpretation of Dr. Allen's progress notes was not supported by substantial evidence. Indeed, it calls into question his role as an impartial examiner.[101]

Dr. Bellino's opinion that there was no medical evidence of Brende's cognitive impairment is also unwarranted. In support, he relied on Brende's apparent ability to speak with a client for 90 minutes in August 2013. Dr. Bellino offered no analysis as to how that conversation rebutted specific complaints about cognitive difficulties noted in Dr. Allen's records. For example, Brende stated that she struggled counting money.[102] It is possible that Dr. Bellino's mischaracterizations and omissions were the result of negligence. However, his errors also call into question his ability to impartially assess Brende's conditions.

Of note, while Dr. Kaplan ultimately concluded that Brende could work a sedentary occupation, he nevertheless acknowledged the existence of her impairment. He wrote: "Even if a substantial portion of her symptoms are psychological in etiology, they are still causing her

---

[97] AR 683.
[98] AR 807.
[99] AR 683.
[100] AR 1047.
[101] Dr. Bellino's impartiality was also called into question in Brende's letter to Reliance through counsel on February 25, 2015. That letter highlighted Dr. Bellino's interpretation and modification of Dr. Drisko's use of the word "temporarily." Apparently finding it better served his opinion, Dr. Bellino modified the word to "temporally" in his review of Brende's file. Subsequent iterations of Dr. Drisko's notes confirm that she in fact intended to use "temporarily." *See* AR 1139.
[102] AR 683.

impairment."[103] Although his speculation about a psychological etiology to Brende's symptoms

was mistaken, even Dr. Kaplan acknowledged that Brende was, in fact, impaired. Similarly,

Nurse Lubrecht's January 16, 2013 acknowledged a "lack of consistent work function."[104] Nurse

Finnegan's December 31, 2013 review of Brende's file conceded that "there is a degree of

neurological impairment."[105]

      Dr. Bellino also inaccurately commented that "[f]atigue is first noted in her visit to Dr.

Bernard [on March 13, 2013], six months after her departure from work."[106] However, Dr.

Bellino failed to acknowledge Dr. Allen's November 2, 2012 note indicating that Brende lied

down to rest after getting her children off to school. He also noted that she had "reduced strength

and stamina and must rest intermittently over the course of the day."[107] While Dr. Allen did not

use the word "fatigue," his notes clearly illustrate that Brende experienced fatigue well before

the date alleged by Dr. Bellino. Furthermore, Dr. Allen's May 4, 2015 progress notes indicate

that fatigue had "been a consistent complaint since the beginning."[108]

      Dr. Bellino's statements regarding the onset of Brende's fatigue essentially served to cast

doubt on her credibility. Additionally, as described above, Dr. Bellino commented on what he

perceived as inconsistencies between her subjective complaints and Dr. Allen's opinions about

her ability to perform daily activities. These comments were also designed to discredit Brende.

Furthermore, Dr. Bellino alleged that Brende's "weakness has never been documented on

examination and would not be impairing to a non-physically demanding occupation even if

---

[103] AR 956.
[104] AR 169.
[105] AR 169.
[106] AR 1047.
[107] AR 806.
[108] AR 976-78.

documented as she symptomatically reports."[109] Because Dr. Bellino did not personally examine Brende, his efforts to discount her credibility were improper. *See Cook v. Prudential Ins. Co. of Am.*, 494 F. App'x 599, 606 (6th Cir. 2012) citing to *Helfman v. GE Group Life Assurance Co.*, 573 F.3d 383, 395–96 (6th Cir. 2009) ("[C]redibility determinations made without the benefit of a physical examination support a conclusion that the decision was arbitrary.").

Reliance also relied upon Dr. Kaplan's belief that there is no evidence to substantiate the presence of Brende's medical conditions. Dr. Kaplan stated, for instance, that Brende's sensory changes could not be confirmed.[110] However, in formulating his opinion, Dr. Kaplan ignored three important pieces of evidence. First, On November 2, 2012, Dr. Allen noted that Brende's tandem gait was difficult.[111] He similarly commented that she was "having some difficulty with ambulation."[112] A comparable finding on October 26, 2012 characterizes her gait as "unstable."[113] Second, an October 2012 MRI notes the presence of a "small foci of abnormal supratentorial white matter."[114] Third, Dr. Allen repeatedly conducted pinprick and temperature tests. Those tests consistently revealed reduced perceptions on Brende's left scalp, thoracic region, arm, and leg.[115]

Further, Dr. Kaplan failed to consider several specific diagnoses provided by Dr. Drisko. Those include a hypothalamic-pituitary-adrenal axis dysfunction,[116] nutritional deficiencies, a methylation disorder, and hormone imbalances.[117] Because Dr. Drisko treating relationship with

---

[109] AR 1047.
[110] AR 477.
[111] AR 809.
[112] AR 809.
[113] AR 812.
[114] AR 812-13.
[115] AR 809.
[116] AR 537.
[117] AR 551.

Brende consisted of thorough exams and testing, Reliance was unreasonable in instead giving weight to Dr. Kaplan's mere review of her symptoms. Dr. Kaplan's was limited and designed to achieve a limiting result.

Reliance attempted to support its position by characterizing three of Dr. Allen's progress notes to suggest that Brende possessed normal strength in her extremities.[118] While Reliance acknowledges the work limitations and restrictions articulated by Brende's physicians, it denies that they should actually apply. Reliance maintains that "the medical evidence does not support the presence of a neurological condition that would warrant work restrictions and limitations from a physical standpoint."[119]

However, any contention that Brende remains strong and able-bodied is not supported by the medical evidence. While it is true that she physically possessed a body potentially capable of exerting ordinary strength, Dr. Allen clearly and repeatedly detailed her lack of actual strength. In a 2012 visit, for instance, he indicated that she had "reduced strength and stamina and must rest intermittently over the course of the day."[120] During a 2014 visit, he noted that her "increased sleep requirement and low strength and stamina."[121] Again, Dr. Allen made these restrictions clear in a form supplied by and returned to Reliance.

Moreover, it is worth noting that Reliance's Final Denial Letter did not address the arguments presented in Brende's February 25, 2015 letter supplementing her appeal of Reliance's initial denial. While Reliance was under no obligation to rebut the letter's precise arguments advanced, there is nothing to suggest that Reliance even considered the evidence that it presented. Reliance's Final Denial Letter offered no rationale as to why it gave no weight to

---

[118] AR 478.
[119] AR 478.
[120] AR 806.
[121] AR 1086.

the findings of Dr. Drisko and Dr. Jones. Likewise, Reliance ignored Dr. Husain's April 2015 opinion. Each of these physicians' opinions were on their own worthy of consideration and discussion. The fact that they were both (1) consistent with one another and (2) contrary to the conclusions drawn by Dr. Bellino and Dr. Kaplan further necessitated that Reliance consider these opinions in its Final Denial Letter.

Finally, even if Reliance was warranted in affording controlling weight to the exams conducted by Dr. Bellino and Dr. Kaplan, those exams do not demonstrate that Brende was capable of returning to her Regular Occupation.

## V.   **CONCLUSION**

Brende should be awarded summary judgment for the foregoing reasons. In addition to the errors committed by Reliance, a final point remains. Brende had no reason to voluntarily and deceptively abandon her established career. Her disability and subsequent departure from her occupation are tragic. In its failure to properly account for and interpret Brende's medical records, Reliance evaded its responsibility to pay her benefits under the policy. Brende accordingly seeks relief from this Court including past and future benefits, interest, attorney fees, costs, and other relief as the Court deems appropriate.

Respectfully submitted,

Date: September 9, 2016                **s/ Kyle H. Sciolaro**

Kyle H. Sciolaro
Bar Number 24991
Attorney for Plaintiff
Burnett & Driskill, Attorneys
19 N. Water Street
Liberty, MO 64068

39

Telephone: (816) 781-4836
Fax: (816) 792-3634
E-mail: ksciolaro@ss-disability.com


**s/ Roger M. Driskill**
Roger M. Driskill
Bar Number 70782
Attorney for Plaintiff
Burnett & Driskill, Attorneys
19 N. Water Street
Liberty, MO 64068
Telephone: (816) 781-4836
Fax: (816) 792-3634
E-mail: rmdriskill@ss-disability.com